[No. 85661-3.   En Banc.]
Argued January 12, 2012.     Decided August 30, 2012.

AUTOMOTIVE UNITED TRADES ORGANIZATION, *Appellant,* v. THE
STATE OF WASHINGTON ET AL., *Respondents.*

*Philip A. Talmadge* and *Sidney C. Tribe* (of *Talmadge/ Fitzpatrick PLLC*), for appellant.

*Robert M. McKenna, Attorney General*, and *Rene D. Tomisser* and *Todd R. Bowers, Senior Counsel*, for respondents.

*Kenneth W. Masters* on behalf of Washington Oil Marketers Association, amicus curiae.

*Howard M. Goodfriend* on behalf of National Federation of Independent Businesses, Washington Food Industry Association, and Washington Association of Neighborhood Stores, amici curiae.

*Kristopher I. Tefft* on behalf of Association of Washington Business, amicus curiae.

*Harry J.F. Korrell III* on behalf of Washington Policy Center, amicus curiae.

*Van A. Collins* on behalf of Associated General Contractors of Washington, Inland Northwest Associated General Contractors, Oregon-Columbia Chapter of the Associated General Contractors of America, Washington Asphalt Pavement Association, Puget Sound Chapter of National Electrical Contractors Association, Mechanical Contractors Association of Washington, National Utility Contractors Association of Washington, American Council of Engineering Companies of Washington, Associated Builders and Contractors of Western Washington, and Washington Aggregates and Concrete Association, amici curiae.

¶1 STEPHENS, J. — The plaintiff brought suit against Washington State and its officials, challenging the consti-

tutionality of disbursements the State gives to Indian tribes under fuel tax compacts. The trial court dismissed the amended complaint for failure to join indispensable parties—namely, the Indian tribes party to the agreements—under CR 19. We reverse.

¶2 We hold the tribes are not indispensable parties under CR 19(b). Although the tribes are *necessary* parties under CR 19(a) whose joinder is not feasible due to tribal sovereign immunity, equitable considerations allow this action to proceed in their absence.

I

## FACTS AND PROCEDURAL HISTORY

¶3 To avoid taxing Indian tribes or their members in Indian Country, in 2007 the legislature amended and added laws relating to the administration of fuel taxes. S.B. REP. on S.B. 5272, 60th Leg., Reg. Sess. (Wash. 2007). This legislation authorizes the governor or her delegate to enter into agreements with any federally recognized Indian tribe within the state "regarding motor vehicle fuel taxes included in the price of fuel delivered to a retail station wholly owned and operated by a tribe, tribal enterprise, or tribal member licensed by the tribe to operate a retail station located on reservation or trust property." RCW 82.36.450(1), (5). Such agreements "may provide mutually agreeable means to address any tribal immunities or any preemption of the state motor vehicle fuel tax." RCW 82.36.450(1).

¶4 Pursuant to this authorization, the State has entered into fuel tax compacts with various tribes. Under most of these compacts, the tribes have agreed to comply with certain statutory requirements in exchange for the State's refunding 75 percent of the state fuel taxes on fuel purchased by the tribes or tribal retailers.

¶5 Automotive United Trades Organization (AUTO), a trade association of Washington gasoline and automotive

service retailers, believes these compacts give tribal retailers an unfair competitive advantage and enable tribal retailers to undercut nontribal retailers' fuel prices. AUTO filed suit in Grays Harbor County Superior Court against the State, the governor, and the director of the licensing department (collectively "the State"), alleging the agreements violate the Washington State Constitution. AUTO sought a declaration that the disbursements from the motor vehicle fund are unconstitutional, an order enjoining these payments, and a writ of prohibition preventing the governor and director from authorizing disbursements from the motor vehicle fund to the tribes.

¶6 After AUTO amended its complaint to add a federal constitutional claim, the defendants timely removed the action to federal court under 28 U.S.C. § 1441(b). Pursuant to the parties' stipulation, however, the federal district court dismissed the federal constitutional claim and remanded the action to state court.

¶7 Shortly thereafter, the defendants moved to dismiss the first amended complaint under CR 12(b)(7) for failure to join the tribes as indispensable parties under CR 19.

¶8 The trial court held the tribes were indispensable and granted the motion to dismiss. AUTO sought leave to file a second amended complaint to join the tribal officials who signed the compacts as defendants. The court denied the motion as futile.

¶9 AUTO sought direct review in this court under RAP 4.2(a). We retained the matter for hearing and decision.

## II

## ANALYSIS

¶10 CR 19 addresses when the joinder of absent persons is needed for a just adjudication. Where the feasibility of joinder is contested, courts engage in a three-step analysis. Under CR 19(a), the court first determines whether

absent persons are "necessary" for a just adjudication.[1] If the absentees are "necessary," the court determines whether it is feasible to order the absentees' joinder. Joinder is not feasible when tribal sovereign immunity applies. *See Equal Emp't Opportunity Comm'n v. Peabody W. Coal Co.*, 400 F.3d 774, 780-81 (9th Cir. 2005). If joining a necessary party is not feasible, the court then considers whether, "in equity and good conscience," the action should still proceed without the absentees under CR 19(b).

¶11 The party urging dismissal bears the burden of persuasion. *See Gildon v. Simon Prop. Grp., Inc.*, 158 Wn.2d 483, 495, 145 P.3d 1196 (2006) (citing 7 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1609, at 129 (3d ed. 2001)). However, if it appears from "an initial appraisal of the facts" that there is an unjoined indispensable party, "the burden devolves on the party whose interests are adverse to the unjoined party to negate this conclusion and a failure to meet that burden will result in the joinder of the party or dismissal of the action." 7 WRIGHT, MILLER & KANE, *supra*, § 1609, at 130.

¶12 We review a trial court's decision under CR 19 for an abuse of discretion and review any legal determinations necessary to that decision de novo. *Gildon*, 158 Wn.2d at 493. Dismissal under CR 12(b)(7) for failure to join an indispensable party is a "drastic remedy" and should be ordered only when the defect cannot be cured and signifi-

---

[1] While the current version of CR 19 and its federal analog refer to persons "to [b]e [j]oined if [f]easible," the term "necessary" is a vestige of prior versions of the rule that has survived in case law. *Compare* CR 19, *and* FED. R. CIV. P. 19, *with* former CR 19 (1963). Although the Washington rule retains the word "indispensable," the present version of Fed. R. Civ. P. 19 recently eliminated it. However, the terms "necessary" and "indispensable" are still used in both state and federal case law "at the price of some confusion." *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 404 n.4 (3d Cir. 1993) (citing *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 116 n.12, 88 S. Ct. 733, 19 L. Ed. 2d 936 (1968) ("Where the new version [of the rule] emphasizes the pragmatic consideration of the effects of the alternatives of proceeding or dismissing, the older version tended to emphasize classification of parties as 'necessary' or 'indispensable.' ")).

cant prejudice to the absentees will result. *Id.* at 494 (citing 7 WRIGHT, MILLER & KANE, *supra*, § 1609, at 130).

¶13 Because CR 19 is based on and is substantially similar to Fed. R. Civ. P. 19, we may look to the abundant federal cases interpreting that rule for guidance. *See Bryant v. Joseph Tree, Inc.*, 119 Wn.2d 210, 218-19, 829 P.2d 1099 (1992) (looking to federal decisions interpreting rule 11).

¶14 On appeal, AUTO advances alternative grounds for reversing the trial court. First, it argues the tribes are not necessary parties under CR 19(a). Assuming they are, AUTO urges joinder is feasible because sovereign immunity does not apply. Should sovereign immunity apply, AUTO contends the action should go forward under CR 19(b) because the tribes are not indispensable. Each of these arguments is considered in turn.

1. The Tribes Are "Necessary" Parties under CR 19(a)(2)(A)

¶15 Whether the tribes are necessary parties is governed by CR 19(a)(2). This subsection provides an absentee is necessary when "he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (A) as a practical matter impair or impede his ability to protect that interest." CR 19(a)(2). To decide whether this rule is met, we determine first whether the absent party claims a legally protected interest in the action and second, whether the absentee's ability to protect that interest will be impaired or impeded. *Wilbur v. Locke*, 423 F.3d 1101, 1112 (9th Cir. 2005), *abrogated on other grounds by Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 130 S. Ct. 2323, 176 L. Ed. 2d 1131 (2010).

¶16 To deserve protection under CR 19(a)(2), the "interest relating to the subject of the action" that is claimed must be sufficiently weighty. A mere financial stake in the action's outcome, or concern about future events that may not come to pass, will not suffice. *Makah*

*Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990) (citing *N. Ala. Envtl. Ctr. v. Hodel*, 803 F.2d 466, 468 (9th Cir. 1986); *McLaughlin v. Int'l Ass'n of Machinists*, 847 F.2d 620, 621 (9th Cir. 1988)). Instead, the interest must be "legally protected." A substantial interest that "arises from terms in bargained contracts" may qualify. *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1023 (9th Cir. 2002).

¶17 Here, the tribes have an interest in receiving payments in accordance with the compacts. AUTO urges that the tribes' interest in contractual benefits cannot be "legally protected," however, because the contracts violate the Washington State Constitution and "[a]n illegal contract conveys no legally protected rights." Reply Br. of Appellant at 8. Similar arguments have been roundly rejected by other courts. CR 19 focuses on whether a party *claims* a protected interest, not whether it *actually has* one. *Am. Greyhound*, 305 F.3d at 1024 ("It is the party's *claim* of a protect[a]ble interest that makes its presence necessary."); *Davis v. United States*, 192 F.3d 951, 958 (10th Cir. 1999).

¶18 AUTO further claims the tribes' interest is not impaired because it seeks relief against only the state officials. Although AUTO denies challenging the provisions in the individual compacts, it seeks equitable relief declaring the payments illegal and enjoining their disbursement. AUTO characterizes its action as focusing on the State's authority and actions under the Washington State Constitution, but it effectively seeks to erode the contracts by preventing the tribes from receiving their bargained-for benefit.

¶19 Thus, as a practical matter, the tribes' bargained-for contractual interest in receiving payments is at risk should AUTO prevail. This is all that is required to make their presence "necessary." *See Wilbur*, 423 F.3d at 1112.

¶20 AUTO next argues that even assuming a protected interest, the State will adequately safeguard tribal interests, minimizing any impairment to such interests. AUTO

urges that State and tribal interests "are perfectly aligned, because they both want a determination that the State's actions are lawful." Reply Br. of Appellant at 12.

¶21 It is established that "[a]s a practical matter, an absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit." *Washington v. Daley*, 173 F.3d 1158, 1167 (9th Cir. 1999). Therefore, the rule that "one whose rights will be affected" is a necessary party has a " 'well recognized exception' "—a beneficiary is not necessary to the action where a trustee is fully representing the beneficiary's interests. *Cheyenne River Sioux Tribe of Indians v. United States*, 338 F.2d 906, 910 (8th Cir. 1964) (quoting *Pan Am. Pet. Corp. v. Udall*, 192 F. Supp. 626, 628 (D.D.C. 1961)).

¶22 Accordingly, in consideration of the special trust relationship that the federal government has with the Indian tribes, the United States can sometimes represent the interests of absent Indian tribes. *See Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 2, 8 L. Ed. 25 (1831) (characterizing tribes as "domestic dependent nations" whose relationship to the United States "resembles that of a ward to his guardian"). However, "[w]hen there is a conflict between the interest of the United States and the interest of Indians, representation of the Indians by the United States is not adequate." *Manygoats v. Kleppe*, 558 F.2d 556, 558 (10th Cir. 1977).

¶23 Here, the State cannot adequately represent the tribes. Unlike the federal government, Washington State lays no claim to a special trust relationship with the Indian tribes. Furthermore, the interests of the tribes in receiving payments and the State's interest in making payments are directly adverse. A conflict of interests negates the possibility of adequate representation.

¶24 Because the tribes are necessary to the action, we next consider whether their joinder is feasible.

## 2. The Tribes Cannot Feasibly Be Joined Due to Sovereign Immunity

¶25 As "domestic dependent nations," the Indian tribes are subject to Congress's plenary authority. *United States v. Long*, 324 F.3d 475, 479 (7th Cir. 2003) (citing *Cherokee Nation*, 30 U.S. (5 Pet.) at 17; *Winton v. Amos*, 255 U.S. 373, 393, 41 S. Ct. 342, 65 L. Ed. 684 (1921)). But where Congress has not abrogated tribal authority, the United States Supreme Court has repeatedly recognized that Indian tribes "retain[ ] their original natural rights" as sovereign entities. *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559, 8 L. Ed. 483 (1832); *see also Holden v. Joy*, 84 U.S. (17 Wall.) 211, 242, 21 L. Ed. 523 (1872); *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 512-13, 60 S. Ct. 653, 84 L. Ed. 894 (1940). In keeping with their sovereign status, it is well settled that Indian tribes enjoy the common law immunity from suit traditionally accorded to sovereign entities. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S. Ct. 1670, 56 L. Ed. 2d 106 (1978) (collecting cases).

¶26 Whether tribal sovereign immunity applies is a question of federal law. *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754, 118 S. Ct. 1700, 140 L. Ed. 2d 981 (1998). Absent the tribe's express waiver of immunity or congressional authorization, an Indian tribe may not be subjected to suit in state or federal courts. *Id.*

¶27 While no magic words are necessary to relinquish tribal sovereign immunity, the intent to do so must be "clear." *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509, 111 S. Ct. 905, 112 L. Ed. 2d 1112 (1991). AUTO contends the dispute resolution provisions in the fuel tax agreements constitute waivers of tribal immunity.

¶28 AUTO submitted two such fuel tax agreements as exhibits to its complaint. But both focus on disputes arising out of the contract between the parties. To this, AUTO asserts that "sovereign immunity once waived is waived.

The tribes do not get to be selective regarding the scope of their waiver." Br. of Appellant at 24.

¶29 In fact, an Indian tribe *may* cabin the extent of its waiver. The greater power to remain utterly immune from suit encompasses the lesser power to consent to suit only on a particular claim or in a particular forum or by a particular party. Sovereign immunity is not an all or nothing proposition, and a narrow waiver does not destroy immunity for all purposes. Because a waiver of immunity " 'is altogether voluntary on the part of [a tribe], it follows that [a tribe] may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted.' " *Am. Indian Agric. Credit Consortium, Inc. v. Standing Rock Sioux Tribe*, 780 F.2d 1374, 1378 (8th Cir. 1985) (quoting *Beers v. Arkansas*, 61 U.S. (20 How.) 527, 529, 15 L. Ed. 991 (1857)). Nothing in the agreements shows consent to be sued by those not parties to the contract. Because there has been no waiver of sovereign immunity, the tribes' joinder is not feasible. We next consider whether the tribes are indispensable under CR 19(b), such that their inability to be joined defeats this action.

3. The Tribes Are Not Indispensable Parties under CR 19(b)

*History of the Doctrine of Indispensability*

¶30 The doctrine of indispensability is rooted in equitable principles. *See Crosby v. Spokane County*, 137 Wn.2d 296, 309, 971 P.2d 32 (1999). Its touchstone is whether the action can proceed without absentees "in equity and good conscience." *Id.* The doctrine favors judicial economy by avoiding redundant proceedings, safeguards judicial dignity by avoiding inconsistent decrees, and preserves the rights of absentees to be heard in controversies affecting their rights.

¶31 While the doctrine's evolution can be traced back several hundred years,[2] the modern rule's formulation has its genesis in the 1854 Supreme Court decision in *Shields v. Barrow*, 58 U.S. (17 How.) 130, 15 L. Ed. 158 (1854). There, the Court classified indispensable parties as those "who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience." *Id.* at 139. It further noted that parties who are merely "necessary," and not "indispensable," are those whose "interests are separable from those of the parties before the court, so that the court can proceed to a decree, and *do complete and final justice*, without affecting [absentees]." *Id.* (emphasis added).

¶32 The *Shields* case furthered the notion that unless "complete justice" can be done, a party is indispensable. *Schutten v. Shell Oil Co.*, 421 F.2d 869, 872 (5th Cir. 1970). In its wake, courts often employed rigid standards for joinder without regard to the attendant equities. *Id.* ("The rise of the concept of the 'complete decree' encroached upon the flexible and rather pragmatic approach to joinder problems which the earlier equity practice had enjoyed and fostered."). Accordingly, a determination that a party was "necessary" often led to a rubber-stamping of the party as "indispensable."

¶33 To counter this trend, federal joinder rules were amended in 1966 to clearly "condition[ ] a finding of 'indispensability' upon 'pragmatic considerations.' " *Id.* at 873 (quoting *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 106-07, 88 S. Ct. 733, 19 L. Ed. 2d 936

---

[2] For a fascinating account of the rule's provenance, *see* Geoffrey C. Hazard, Jr., *Indispensable Party: The Historical Origin of a Procedural Phantom*, 61 COLUM. L. REV. 1254 (1961). The author, no fan of the indispensable party, "attempt[s] to show that the lineage of the indispensable party rule is no better than its logic." *Id.* at 1289.

(1968)). Washington's civil rules followed suit. *Compare* former CR 19 (1963), *with* former CR 19 (1967).

### *CR 19(b) Considerations and the Trial Court's Decision*

¶34 Consideration of whether a party is indispensable under CR 19(b) "calls for determinations that are heavily influenced by the facts and circumstances of individual cases." 7 WRIGHT, MILLER & KANE, *supra*, § 1604, at 39, *quoted in Burt v. Dep't of Corr.*, 168 Wn.2d 828, 842, 231 P.3d 191 (2010) (Alexander, J., dissenting).

¶35 As with all equitable standards, the proper application of CR 19(b) involves a careful exercise of discretion and defies mechanical application. In examining each of the four factors, as well as any other relevant considerations, the court determines how heavily the factor weighs in favor of, or against, dismissal. The court then determines whether the case can proceed "in equity and good conscience" without the absentee in light of these factors. Because there are no disputed factual issues, we stand in the same position as the trial court and may evaluate the CR 19(b) criteria independently. *See Smith v. Skagit County*, 75 Wn.2d 715, 718, 453 P.2d 832 (1969). Accordingly, we turn to the first factor.

### *CR 19(b)(1): Prejudice*

¶36 We begin by considering "to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties." CR 19(b)(1). While some courts have characterized this factor as " 'largely duplicat[ing] the consideration that made a party necessary under Rule 19(a),' " *Wilbur*, 423 F.3d at 1114 (quoting *Am. Greyhound*, 305 F.3d at 1024-25), the rule's language makes it clear that these inquiries are not redundant. Under CR 19(a), the court conducts a threshold inquiry into the *possibility* of prejudice, while under CR 19(b), the court assesses the *likelihood and significance* of any prejudice.

¶37 In evaluating the extent of prejudice, we accord heavy weight to the tribes' sovereign status. Tribal sover-

eign immunity "is a necessary corollary to Indian sovereignty and self-governance." *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g, PC*, 476 U.S. 877, 890, 106 S. Ct. 2305, 90 L. Ed. 2d 881 (1986). Where tribal sovereign immunity is concerned, "respect for the inherent autonomy Indian tribes enjoy has been particularly enduring." *Fla. Paraplegic Ass'n v. Miccosukee Tribe of Indians of Fla.*, 166 F.3d 1126, 1130 (11th Cir. 1999).

¶38 Indeed, in the federal courts, comity and respect for sovereign interests often outweigh all other factors in disposing of the joinder question, even in cases presenting constitutional challenges to governmental conduct. *See, e.g., Shermoen v. United States*, 982 F.2d 1312 (9th Cir. 1992) (challenging the constitutionality of the Hoopa-Yurok Settlement Act, 25 U.S.C. § 1300i); *Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542, 548 (2d Cir. 1991) ("It has been held that when an indispensable party is 'immune from suit, there is very little room for balancing of other factors set out in [r]ule 19(b), because immunity may be viewed as one of those interests compelling by themselves.'" (alteration in original) (internal quotation marks omitted) (quoting *Enter. Mgmt. Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890, 894 (10th Cir. 1989))). As the Second Circuit Court of Appeals reasoned:

> The rationale behind the emphasis placed on immunity in the weighing of rule 19(b) factors is that the case is not one "where some procedural defect such as venue precludes litigation of the case. Rather, the dismissal turns on the fact that society has consciously opted to shield Indian tribes from suit without congressional or tribal consent."

928 F.2d at 548 (quoting *Wichita & Affiliated Tribes of Okla. v. Hodel*, 252 U.S. App. D.C. 140, 788 F.2d 765, 777 (1986)). Embracing this same rationale, two Washington Court of Appeals decisions have dismissed challenges to state-tribe compacts. *Mudarri v. State*, 147 Wn. App. 590, 196 P.3d 153 (2008) (gambling compacts); *Matheson v. Gregoire*, 139 Wn. App. 624, 161 P.3d 486 (2007) (cigarette compacts).

¶39 Here, the extent of prejudice to the tribes may be significant, even though the absent tribes will not themselves be bound by a ruling. *See Am. Greyhound*, 305 F.3d at 1024 ("It is true that the tribes are not bound by [the lower court's] ruling under principles of res judicata or collateral estoppel because they are not parties, but their interests may well be affected *as a practical matter* by the judgment that its operations are illegal. The sovereign power of the tribes to negotiate compacts is impaired by the ruling." (citation omitted)); *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002). This first factor strongly favors dismissal.

### CR 19(b)(2): Ability To Fashion Adequate Relief

¶40 The second factor we consider is "the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided." CR 19(b)(2). The only prejudice-lessening measure that has been proposed by the appellant is joining the tribal officials who signed or enforced the compacts. This argument is a nonstarter because the real party in interest, in a suit against these tribal officers in their official capacities, is the tribe itself—which is immune. Joining the tribal officials would not decrease the prejudice faced by the tribes,[3] and therefore the second CR 19(b) factor favors dismissal.

### CR 19(b)(3): Adequacy of a Judgment

¶41 The third CR 19(b) factor—the adequacy of a judgment rendered without the absentee tribes—supports

---

[3] AUTO cites to various federal cases to argue that tribal officials are not immune from suits seeking prospective relief for constitutional violations. *See* Br. of Appellant at 26-30. However, it was only because these cases all alleged violations of *federal* law that the courts applied the doctrine developed in *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908). The *Young* exception to immunity simply does not apply to violations of *state* constitutional law, however, because tribal officials are not subject to the Washington State Constitution. Therefore, AUTO's reliance on cases applying *Young* to tribal officials for violations of federal law is inapt.

dismissal, although weakly. "Adequacy" in this context "refers to the 'public stake in settling disputes by wholes, whenever possible.'" *Republic of Philippines v. Pimentel,* 553 U.S. 851, 870, 128 S. Ct. 2180, 171 L. Ed. 2d 131 (2008) (quoting *Provident Tradesmens Bank,* 390 U.S. at 111). Here, no possibility of settling this dispute by "wholes" exists because no other forum is available.

*CR 19(b)(4): Absence of Any Remedy*

¶42 Finally, we consider the plaintiff's lack of an adequate remedy if the action is dismissed. Because there appears to be no other judicial forum in which plaintiffs can seek relief, the plaintiff lacks an adequate remedy in the event of dismissal. The dissent dodges this by equating a legislative fix with a judicial remedy, pointing to a house bill introduced during the pendency of this case. *See* H.B. 2013, 62d Leg., Reg. Sess. (Wash. 2011). As an initial matter, even if this bill were eventually enacted—a big "if," considering it has failed to advance for several legislative sessions—the bill may not provide relief to AUTO because its new requirements apply only to fuel tax compacts entered into or renegotiated after the effective date of this section. While the bill would impose a duty on the governor to attempt to renegotiate terms of existing compacts, it is pure speculation whether such renegotiation would be achieved.

¶43 Setting aside the implausibility of achieving any legislative "relief," the dissent employs faulty logic. It is no more of an answer to say the plaintiffs can lobby the legislature than it is to say that tribes can waive their immunity and join in the lawsuit. Of course, neither of these "solutions" addresses the CR 19 analysis. Moreover, the notion that potentially unconstitutional government conduct must be redressed through the legislature is frankly astonishing given the bedrock principle that it is "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 176, 2 L. Ed. 60 (1803).

¶44 Convincingly, no other court has considered a potential legislative act as constituting an adequate alternative remedy. Instead, it is clear that "[t]he fourth factor . . . indicates that the court should consider whether there is any assurance that the plaintiff, if dismissed, could sue effectively in another forum where better joinder would be possible." FED. R. CIV. P. 19 advisory committee's note to 1966 amendments. Here, this factor counsels strongly in favor of proceeding in the tribes' absence. In light of our strong aversion to dismissal, *Gildon*, 158 Wn.2d at 494, we give this factor great weight.

### *Balancing the CR 19(b) Factors*

¶45 At root, CR 19 exists to allow disputes to be settled with all parties present whenever possible. This is reflected in *Shields*, which entreated courts of equity to "do complete justice, by adjusting all the rights involved." *Shields*, 58 U.S. at 139.

¶46 But "complete justice" may not be served when a plaintiff is divested of all possible relief because an absent party is a sovereign entity. In such an instance, the quest for "complete justice" ironically leads to none at all—an outcome at odds with the equitable purposes underlying compulsory joinder. Nor does our respect for sovereign immunity compel this result. Sovereign immunity is meant to be raised as a shield by the tribe, not wielded as a sword by the State. An absentee's sovereign immunity need not trump all countervailing considerations to require automatic dismissal.

¶47 Instead, courts must carefully consider the circumstances of each case in balancing prejudice to the absentee's interests against the plaintiff's interest in adjudicating the dispute. The circumstances presented by this case raise constitutional questions about government conduct and implicate the absentee's contractual interests. Where no other forum is available to the plaintiff, the balance tips in favor of allowing this suit to proceed without the tribes.

This conclusion does not minimize the importance of tribal sovereign immunity but, rather, recognizes that dismissal would have the effect of immunizing *the State*, not the tribes, from judicial review.[4]

¶48 Some courts have recognized that potential prejudice to tribal contractual interests may be outweighed by the broader public interest in having important and potentially far-reaching issues resolved in court. *Saratoga County Chamber of Commerce, Inc. v. Pataki*, 100 N.Y.2d 801, 820, 798 N.E.2d 1047, 766 N.Y.S.2d 654 (2003) ("While sovereign immunity prevents the Tribe from being forced to participate in New York Court proceedings, it does not require everyone else to forego the resolution of all disputes that could affect the Tribe."); *Dairyland Greyhound Park, Inc. v. McCallum*, 2002 WI App 259, 258 Wis. 2d 210, 655 N.W.2d 474, 487 ("If this action is dismissed because the tribes cannot be joined as parties, not only will [the plaintiff] have no adequate remedy, but an important legal issue having significant public policy implications will evade resolution."); *People ex rel. Lungren v. Cmty. Redevelopment Agency*, 56 Cal. App. 4th 868, 65 Cal. Rptr. 2d 786, 794-95 (1997) ("If it is established that the law of California does not permit a court to hear a challenge to the actions of the Agency in the present case because of an inability to join the Tribe in the suit, the effect will be to immunize any local entity from court review of transfers of publicly owned real property to Indian tribes."). In the circumstances of this case, we adopt this view. The dissent's suggestion that the legislature conclusively speaks for the people—who therefore have no meaningful interest in the case—makes little sense given the constitutional nature of the challenge.

---

[4] AUTO also raises the "public rights exception" to the indispensable party rule as a basis to avoid dismissal. One court has observed that it makes no difference whether the public interest at issue is considered under this exception or in conjunction with the enumerated factors under CR 19(b). *Dairyland Greyhound Park, Inc. v. McCallum*, 2002 WI App 259, 258 Wis. 2d 210, 655 N.W.2d 474, 486 n.14. We agree. Any meaningful analysis of the CR 19(b) factors necessarily includes consideration of the consequences to the public of denying a judicial forum to review the constitutionality of governmental conduct.

When the constitution and a legislative enactment collide, it is the constitution that represents the interests of the people. In this case, the public interest in having the constitutionality of executive conduct addressed is paramount.

## III

## CONCLUSION

¶49 While the tribes are *necessary* parties whose joinder is not feasible due to sovereign immunity, in the circumstances of this case they are not *indispensable*. We reverse the trial court's order of dismissal and hold that this action can proceed without the tribes "in equity and good conscience" under CR 19(b).[5]

C. JOHNSON, CHAMBERS, J.M. JOHNSON, and WIGGINS, JJ., concur.

¶50 FAIRHURST, J. (dissenting) — Under a proper CR 19(b) analysis, the Indian tribes are indispensable parties and they will be severely prejudiced by a state court judgment rendered in their absence. Because the majority incorrectly holds that the tribes are not indispensable parties, it seriously undermines the doctrine of tribal sovereign immunity and weakens the law. I dissent.

## ANALYSIS

¶51 The issue in this case is whether Automotive United Trades Organization (AUTO) may sue the State over gas tax compacts involving certain Indian tribes. As discussed by the majority, the tribes that are party to the compacts

---

[5] We deny AUTO's December 21, 2011 motion to supplement the record on appeal under RAP 9.11 because AUTO fails to demonstrate additional proof is necessary or would change the decision under review.

are necessary to the action under CR 19(a)(2)(A) and cannot be joined due to sovereign immunity. When a party is necessary to an action and cannot be joined, a court must determine whether the action should proceed without the party "in equity and good conscience" or be dismissed. CR 19(b). If the action must be dismissed, the absent party is regarded as "indispensable." *Id.*

¶52 In determining whether an absent party is indispensable, a court must consider

> (1) the extent to which a judgment rendered in the party's absence might be prejudicial to that party or to those already parties; (2) the extent to which the prejudice can be lessened or avoided by protective provisions in the judgment, by shaping of relief, or other measures; (3) whether a judgment rendered in the party's absence will be adequate; and (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

*Mudarri v. State*, 147 Wn. App. 590, 604-05, 196 P.3d 153 (2008). "These four factors are not rigid, technical tests, but rather 'guides to the overarching "equity and good conscience" determination.'" *Wichita & Affiliated Tribes of Okla. v. Hodel*, 252 U.S. App. D.C. 140, 788 F.2d 765, 774 (1986) (quoting *Cloverleaf Standardbred Owners Ass'n v. Nat'l Bank of Wash.*, 226 U.S. App. D.C. 122, 699 F.2d 1274, 1279 n.11 (1983) (quoting Fed. R. Civ. P. 19(b))).

¶53 As will be explained below, the tribes are clearly indispensable parties; a judgment rendered in the tribes' absence will prejudice their interest in the compacts, weaken their ability to negotiate for future contracts, impede their sovereign right to govern their reservations, and undermine their interest in tribal sovereign immunity. AUTO's interest in litigating its suit pales in comparison. The majority holds otherwise because it improperly focuses on only one CR 19(b) factor, improperly narrows the tribes' interests, and improperly inserts the public into its analysis. As a result, the majority's decision undermines the

principle of tribal sovereignty, erodes the doctrine of sovereign immunity, and weakens the law.

## A. The Tribes Are Indispensable Parties

### 1. *A judgment rendered in the tribes' absence will severely prejudice the tribes*

¶54  CR 19(b)(1) requires a court to consider the extent to which a judgment rendered in the tribes' absence might prejudice the tribes or existing parties. In this case, the tribes have at least four interests that will be subject to severe prejudice. When the tribes' interests are fully considered, CR 19(b)(1) favors dismissal so strongly that it is nearly dispositive.

¶55 First, an unfavorable judgment would seriously prejudice the tribes' contractual interest in the compacts. If a court were to grant AUTO's requested relief, it would, in effect, declare the compacts unconstitutional and unenforceable. Although the tribes would not be bound by the court's ruling, the compacts would essentially disintegrate and the tribes would lose the fuel tax refunds to which they are entitled. In 2008 and 2009, approximately $37.3 million was disbursed to the tribes pursuant to the compacts. Clerk's Papers (CP) at 106. Accordingly, "[t]he amount of prejudice to the tribes from termination of existing compacts . . . would be enormous." *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1025 (9th Cir. 2002).

¶56 Second, an unfavorable judgment would seriously prejudice the tribes' ability to negotiate for future contracts and compacts. *See Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1162 (9th Cir. 2002) (A decision rendered in the Nation's absence would "prejudice the Nation's sovereign interests in negotiating contractual obligations."); *Am. Greyhound Racing*, 305 F.3d at 1025 ("The amount of prejudice to the tribes from . . . inability to enter new [compacts] would be enormous."). The State and the Indian tribes located in

Washington have a long history of contentious disputes regarding the State's authority to tax fuel sold by and to the tribes, and contract negotiation has been an important tribal tool. *See, e.g.,* CP at 315-16. A judgment favoring AUTO would make it much less likely that the tribes could negotiate for compacts in the future.

¶57 Third, an unfavorable judgment would seriously prejudice tribal sovereignty—the tribes' "inherent right or power to govern" their own reservations. WILLIAM C. CANBY, JR., AMERICAN INDIAN LAW IN A NUTSHELL 76 (5th ed. 2009). Under the compacts, refunds are made to the tribes, not tribal retailers, and are used for typical government projects—"[p]lanning, construction, and maintenance of roads, bridges, and boat ramps; transit services and facilities; transportation planning; [and] police services." RCW 82.38.310(3)(b). Because these projects are at least partly funded through the compacts, a judgment against the State would substantially impede the tribes' sovereign ability to provide these vital services. *See Dawavendewa,* 276 F.3d at 1162 (A decision rendered in the Nation's absence would "prejudice the Nation's sovereign interests in . . . governing the reservation."). State courts should be particularly hesitant to diminish the sovereign status of tribes, which the United States Supreme Court recognized in response to states' infringement on tribal authority and which has endured despite repeated state challenges. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 6.01[2] (2005 ed.) (tracing federal recognition of tribal independence from state jurisdiction to *Worcester v. Georgia,* 31 U.S. 515, 8 L. Ed. 483 (1832)).

¶58 Fourth, *any* judgment would "effectively abrogate the Tribe's sovereign immunity." *Enter. Mgmt. Consultants, Inc. v. United States ex rel. Hodel,* 883 F.2d 890, 894 (10th Cir. 1989). Tribal sovereign immunity is "[t]he principle that tribes enjoy the sovereign's common law immunity from suit." CANBY, *supra,* at 101. As "a necessary corollary to Indian sovereignty and self-governance," *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g, PC,* 476 U.S.

877, 890, 106 S. Ct. 2305, 90 L. Ed. 2d 881 (1986), the doctrine "recognizes the sovereignty of Indian tribes and seeks to preserve their autonomy [by protecting] tribes from suits in federal and state courts." *Wichita*, 788 F.2d at 771. "[T]ribal immunity is a matter of federal law and is not subject to diminution by the States." *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 756, 760, 118 S. Ct. 1700, 140 L. Ed. 2d 981 (1998) (reversing a state appellate court decision that Indian tribes were subject to suit in state court for breaches of contract that involved off-reservation commercial conduct).

¶59 Based on the doctrine, tribes have a "sovereign right not to have [their] legal duties judicially determined without consent." *Enter. Mgmt. Consultants*, 883 F.2d at 894. Accordingly, tribes enjoy sovereign immunity from lawsuits "even when other parties having an interest in the case *may* be brought before the court." STEPHEN L. PEVAR, THE RIGHTS OF INDIANS AND TRIBES 355 (3d ed. 2002). The issue in such cases is whether a tribe's interests will be "affected by the outcome." *Id.* As explained above, the tribes' contractual and sovereign interests will clearly be affected by the outcome of AUTO's suit. Therefore, a judgment rendered in the tribes' absence will undermine the tribes' sovereign immunity even if the judgment favors the State.

### 2. *Prejudice to the tribes cannot be lessened or avoided*

¶60 CR 19(b)(2) requires a court to consider the extent to which any prejudice could be lessened or avoided. This factor also strongly favors dismissal. Because AUTO seeks a declaratory judgment that the fuel tax remittances are unconstitutional and unenforceable, no shaping of the judgment could mitigate the prejudice to the tribes. AUTO's relief, if granted, would completely deprive the tribes of their right to a refund of the fuel tax revenues for which they bargained, hinder the tribes' ability to provide crucial government services, and undermine the tribes' ability to negotiate for future compacts. Even if the State prevails,

the adjudication itself would abrogate the tribes' sovereign immunity.

### 3. *A judgment rendered in the tribes' absence will be inadequate*

¶61 CR 19(b)(3) requires a court to consider whether a judgment rendered in the tribes' absence will be adequate.[6] Because no other judicial forum is available for AUTO's suit, CR 19(b)(3) strongly favors dismissal. Our Court of Appeals has even found this factor dispositive under analogous facts. In *Mudarri*, 147 Wn. App. 590, a private casino owner filed a declaratory judgment action against the State, seeking to invalidate a state-tribal compact granting the tribe the exclusive right to operate electronic scratch ticket games at its casino. The Court of Appeals found that the trial court could not adequately address the plaintiff's claims in the tribe's absence and held that the tribe was an indispensable party. The same principle applies in this case.

### 4. *If the case were dismissed, AUTO would not have a judicial remedy, but it could lobby the legislature to change the law*

¶62 Finally, CR 19(b)(4) requires a court to consider whether the plaintiff would have an adequate remedy if the action were dismissed. Because dismissal would deprive AUTO of a judicial forum, this factor opposes dismissal.

¶63 But an action should not proceed "solely because the plaintiff otherwise would not have an adequate remedy." 3A JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE ¶ 19.07-2[4], at 19-153 (2d ed. 1984). When the other CR 19(b) factors

---

[6] In this context, adequacy involves "the interest of the courts and the public in complete, consistent, and efficient settlement of controversies." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111, 88 S. Ct. 733, 19 L. Ed. 2d 936 (1968). We read this factor "to refer to this public stake in settling disputes by wholes, whenever possible, for clearly the plaintiff, who himself chose both the forum and the parties defendant, will not be heard to complain about the sufficiency of the relief obtainable against them." *Id.*

outweigh the plaintiff's interest in litigation, dismissal is the proper result. Accordingly, Washington and federal cases with analogous facts provide that dismissal is appropriate, even though the plaintiff may not have access to a judicial forum. *See, e.g., Wilbur v. Locke*, 423 F.3d 1101 (9th Cir. 2005) (tribe's interest in sovereign immunity outweighs plaintiffs' lack of remedy, even where plaintiffs sought to invalidate a state-tribal cigarette tax agreement), *abrogated on other grounds by Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 130 S. Ct. 2323, 176 L. Ed. 2d 1131 (2010).

¶64 Further, as noted by the State, AUTO could lobby the legislature to change the law. Indeed, while AUTO was pursuing this case through the courts, a bill was introduced that would have provided AUTO's requested relief. *See* H.B. 2013, 62d Leg., Reg. Sess. (Wash. 2011).[7] If the court dismissed AUTO's suit, AUTO would not necessarily be "divested of all possible relief." Majority at 233. Rather, AUTO would not have access to a judicial forum.[8]

### 5. *When properly balanced, the factors strongly favor dismissal*

¶65 When the parties' interests are properly balanced, AUTO's case should be dismissed. CR 19(b). As explained above, the first three factors strongly favor dismissal, and only one factor favors AUTO. Even if the factors were equally weighted, the first three factors, which favor dismissal, outweigh the fourth factor, which does not.

¶66 Further, CR 19(b)(1) favors dismissal so strongly that it is nearly dispositive. *See Wichita*, 788 F.2d at 777

---

[7] In 2012, the bill was reintroduced and retained in its present status.

[8] The majority criticizes our assertion that AUTO could petition the legislature, asserting that it is "pure speculation whether such renegotiation would be achieved." Majority at 232. This criticism wrongly presupposes that the outcome of any review or lobbying process is somehow guaranteed. We do not suggest that AUTO is guaranteed to change the law, but that AUTO has an alternate forum to air its views. Additionally, our opinion does not depend on the possibility of legislative relief. Even if AUTO were unable to petition the legislature, AUTO's suit would still require dismissal due to tribal sovereign immunity.

n.13 (When a necessary party is immune from suit, "there is very little room for balancing of other factors."). In fact, sovereign immunity "may be viewed as one of those interests 'compelling by themselves.' " 3A MOORE, *supra*, ¶ 19.15, at 19-266 n.6 (quoting *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 119, 88 S. Ct. 733, 19 L. Ed. 2d 936 (1968)). When the tribes' interest in sovereign immunity is taken into account, dismissal is the only proper result.

¶67 While this result may seem harsh, it should not seem surprising; courts have long understood that the doctrine of sovereign immunity shields certain controversies from judicial review. In fact, dismissal "is a common consequence of sovereign immunity." *Am. Greyhound Racing*, 305 F.3d at 1025. Based on this principle, the Ninth Circuit Court of Appeals has "regularly held that the tribal interest in immunity overcomes the lack of an alternative remedy or forum for the plaintiffs." *Id.* (citing *Dawavendewa*, 276 F.3d at 1162); *see also Clinton v. Babbitt*, 180 F.3d 1081, 1090 (9th Cir. 1999); *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996); *Pit River Home & Agric. Coop. v. United States*, 30 F.3d 1088, 1102 (9th Cir. 1994); *Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 1460 (9th Cir. 1994); *Confederated Tribes of Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1500 (9th Cir. 1991); *Makah Indian Tribe v. Verity*, 910 F.2d 555, 560 (9th Cir. 1990); *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1326-27 (9th Cir. 1975). Two Washington Court of Appeals decisions have also dismissed challenges to state-tribal compacts: *Mudarri*, 147 Wn. App. 590, and *Matheson v. Gregoire*, 139 Wn. App. 624, 161 P.3d 486 (2007).[9] To protect the tribes' historic interest in maintaining their sovereignty, we should likewise dismiss AUTO's challenge.

---

[9] The majority acknowledges these cases without stating they were wrongly decided. Majority at 230.

B.  The Majority's Holding Undermines the Doctrine of Sovereign Immunity

¶68 The majority incorrectly concludes that the tribes are not indispensable parties for three reasons: it improperly focuses on only one CR 19(b) factor, it improperly frames the tribes' interests, and it improperly inserts the public into its CR 19(b) analysis. As a result, the majority seriously undermines the doctrine of sovereign immunity and weakens the law.

¶69 First, the majority improperly focuses on only one factor, CR 19(b)(4). The majority itself acknowledges that only CR 19(b)(4) favors AUTO, but it holds that this one factor outweighs *all of the other factors combined*. This approach is incorrect. A court must consider all factors in a balancing test, not just one. Further, authorities agree that an action should not proceed "solely because the plaintiff otherwise would not have an adequate remedy." 3A MOORE, *supra*, ¶ 19.07-2[4], at 19-153. Because the majority is overly concerned that AUTO will not have access to a judicial forum, the majority misconstrues the joinder rule and "contravene[s] the established doctrine of indispensability." *Id.*

¶70 The majority not only improperly focuses on CR 19(b)(4) but also improperly narrows the tribes' interests. When balancing the CR 19(b) factors, the majority says, "[t]he circumstances presented by this case . . . implicate the absentee's contractual interests." Majority at 233. It then cites cases for the proposition "that potential prejudice to tribal contractual interests may be outweighed by the broader public interest in having important and potentially far-reaching issues resolved in court." *Id.* at 234. In other words, the majority characterizes the tribes' interest as a mere contractual interest and ignores the tribes' other substantial interests, including its sovereign interests. This approach is incorrect because, as noted above, the tribes have at least four crucial interests that will be subjected to severe prejudice.

¶71 Finally, the majority not only artificially narrows the tribes' interests but also improperly broadens AUTO's interests to include the public interest. *See* majority at 234 n.4 ("Any meaningful analysis of the CR 19(b) factors necessarily includes consideration of the consequences to the public of denying a judicial forum to review the constitutionality of governmental conduct."). This approach is improper because CR 19(b) does not involve consideration of the broader public interest; it involves only the interests of the "parties" and the "absent person." The one factor that involves the plaintiff's interest, the fourth factor, specifically considers "whether the *plaintiff* will have an adequate remedy," it does not consider whether the *public* will be served. CR 19(b)(4) (emphasis added). The majority's approach is particularly puzzling because the State, not AUTO, represents the interests of the people as expressed through the legislature. *See Island County v. State*, 135 Wn.2d 141, 147, 955 P.2d 377 (1998) ("[T]he Legislature speaks for the people."). The legislature has specifically authorized the governor to enter into the agreements at issue here. *See* RCW 82.36.450. AUTO does not argue that the agreements lack legislative authorization, nor would such an argument have merit.[10] AUTO also does not argue that the State was not authorized to enter into agreements with tribes. Rather, AUTO complains that the agreements provide for unlawful disbursements of funds, which "cause AUTO members to suffer an economic injury." CP at 3.

¶72 By inserting the public into its analysis, the majority essentially conflates CR 19(b) with the public rights doctrine. The public rights doctrine may provide an exception

---

[10] For this reason, the majority's reliance on *Saratoga County Chamber of Commerce, Inc. v. Pataki*, 100 N.Y.2d 801, 820, 798 N.E.2d 1047, 766 N.Y.S.2d 654 (2003) and *Dairyland Greyhound Park, Inc. v. McCallum*, 2002 WI App 259, 258 Wis. 2d 210, 655 N.W.2d 474 is misplaced. Both cases involve challenges to an executive's authority to enter into agreements *without legislative approval*. Even AUTO concedes that the Washington State Legislature has expressly authorized the governor to enter into the challenged agreements. CP at 103.

to CR 19 dismissal when a plaintiff is seeking to vindicate a public right. 3A MOORE, *supra*, ¶ 19.07, at 19-100 to -101, 19-133 to -137 ("In actions involving public rights, for example, the fact that a third party may be adversely affected by the litigation is insufficient in itself to justify treating him as an indispensable party.").

¶73 But the public rights doctrine applies only when an action seeks to vindicate a public right, not a private interest. *Shermoen v. United States*, 982 F.2d 1312, 1319 (9th Cir. 1992); *Nat'l Licorice Co. v. Nat'l Labor Relations Bd.*, 309 U.S. 350, 60 S. Ct. 569, 84 L. Ed. 799 (1940). Although AUTO, an association of gas retailers, argues that it seeks to vindicate the public's interest, it has acknowledged in a more candid moment that it has a competitive business motive for trying to stop gas tax refunds to the tribes—to redress its own "economic injury." CP at 3. Even the majority acknowledges that this case is really about the cost of gas. *See* majority at 221 (AUTO "believes these compacts give tribal retailers an unfair competitive advantage and enable [them] to undercut nontribal retailers' fuel prices."). It also acknowledges that AUTO seeks to undermine the contracts and merely "characterizes" its interest as a constitutional interest. *Id.* at 224 ("AUTO characterizes its action as focusing on the State's authority and actions under the Washington State Constitution, but it effectively seeks to erode the contracts."). Because AUTO is truly seeking to vindicate its private economic interest, the public rights doctrine does not apply.[11]

¶74 Further, even if AUTO were truly seeking to vindicate a public right, the public rights doctrine is not available when the requested relief would deprive the absent

---

[11] Today's decision is particularly troubling because it provides a blueprint for any allegedly aggrieved plaintiff to circumvent long established principles of tribal sovereign immunity. From this point forward, a plaintiff seeking to redress an economic injury need only *allege* that the State's conduct is unconstitutional. The plaintiff's interest then expands to include "the public interest in having the constitutionality of executive conduct addressed" and magically becomes "paramount." Majority at 235.

party of its contractual rights. *Shermoen*, 982 F.2d at 1319 ("[T]he public rights exception to joinder rules is an acceptable intrusion upon the rights of absent parties only insofar as the 'adjudication[ ] do[es] not destroy the legal entitlements of the absent parties.' " (second and third alterations in original) (quoting *Conner v. Burford*, 848 F.2d 1441, 1459 (9th Cir. 1988))). Because the present litigation threatens the tribes' legal entitlements in the compacts, the public rights doctrine is not available. *Id.*

¶75 As a result of its improper analysis, the majority prejudices or potentially prejudices the tribes' substantial interests. The majority claims to accord "heavy weight" to the tribes' sovereign status, majority at 229, but by allowing a state court to determine the tribes' contractual rights without the tribes' consent, the majority effectively subjects the tribes to state court jurisdiction and undermines tribal sovereign immunity. This result is contrary to the basic principles of Indian law. *See Wichita*, 788 F.2d at 777 ("[S]ociety has consciously opted to shield Indian tribes from suit without congressional or tribal consent."). Courts have long understood that the consequence of recognizing any form of immunity is that some controversies are shielded from judicial review.

## CONCLUSION

¶76 This case cannot proceed "in equity and good conscience." CR 19(b). The tribes' substantial interests far outweigh AUTO's much weaker interest in litigating its claim. By holding otherwise, the majority undermines the doctrine of sovereign immunity and weakens the law. I do not and cannot agree. I dissent.

MADSEN, C.J., and OWENS and GONZÁLEZ, JJ., concur with FAIRHURST, J.