# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MAKAH INDIAN TRIBE, | No. 54945-0-II |
| Appellant | |
| v. | |
| COMMISSIONER OF PUBLIC LAND HILARY FRANZ (in her official capacity), the WASHINGTON STATE DEPTMENT OF NATURAL RESOURCES, and the WASHINGTON STATE BOARD OF NATURAL RESOURCES, | UNPUBLISHED OPINION |
| Respondents. | |

SUTTON, J. — The Makah Indian Tribe appeals the superior court's order denying a constitutional writ to block a land exchange proposed by the Department of Natural Resources (DNR) and approved by the Board of Natural Resources.[1] The land exchange, called the "Peninsula Exchange," would exchange state forestlands with forestlands owned by a private timber company, Merrill & Ring. The Peninsula Exchange parcels border tribal lands of a number of Indian tribes, including the Makah, the Hoh, the Quileute, and the Quinault. The Makah argue that DNR violated (1) the State Environmental Policy Act (SEPA)[2] by failing to conduct a SEPA

---

[1] The Respondents are the Commissioner of Public Lands, Hillary Franz (in her official capacity); the Washington State DNR, and the Board. Because the Makah's allegations relate primarily to DNR's and the Board's decisions regarding the land exchange, we refer to respondents collectively as "DNR" except where indicated otherwise.

[2] Ch. 43.21C RCW.

environmental review prior to approval of the proposal and (2) the public lands management statute, Title 79 RCW, by insufficiently addressing the Makah's concerns.

The Hoh, Quileute, and Quinault Tribes (the Amici Tribes) filed a joint amicus curiae brief requesting dismissal under CR 19, arguing that they are necessary and indispensable parties who cannot be joined due to their sovereign immunity.[3] The Amici Tribes claim that the Peninsula Exchange parcels are part of their respective treaty hunting areas. The Makah argue that the Amici Tribes are not necessary and indispensable parties under CR 19 because this appeal can be decided without a determination of treaty rights of various tribes as the Makah's claims are procedural challenges to DNR's Peninsula Exchange.

Because we resolve this appeal without implicating the treaty rights of the various interested tribes, we hold that the Amici Tribes are not necessary or indispensable parties. Accordingly, dismissal of this appeal under CR 19 is not appropriate.

DNR's interpretation of the SEPA categorical exemption is entitled to substantial weight and its determination that a land exchange is categorically exempt from SEPA review will be overturned only if it is clearly erroneous. We hold that DNR properly interpreted and applied the SEPA categorical exemption for state land exchanges to determine that the Peninsula Exchange was categorially exempt from SEPA review and that DNR's finding that the Peninsula Exchange was exempt from SEPA was not clearly erroneous. Additionally, DNR complied with the public lands management statute by adequately consulting with the Makah prior to the Board's approval of the Peninsula Exchange. Because the superior court's decision was not manifestly

---

[3] The Amici Tribes were not joined below and they did not seek to intervene.

unreasonable, or exercised on untenable grounds or for untenable reasons, we hold that the superior court did not abuse its discretion by denying the Makah a constitutional writ. We affirm.[4]

FACTS

I. BACKGROUND

A. THE PARTIES

The Makah are a sovereign federally recognized Indian tribe. CP at 7. "Members of the Makah Tribe and their ancestors have resided, fished, hunted[,] and gathered on the northwest Olympic Peninsula since time immemorial, and continue to rely on the availability and use of natural resources to sustain their way of life." Opening Br. of Makah Indian Tribe (Opening Br. Appellant at 11-12. "Fishing, hunting, and gathering practices are deeply ingrained in the [Makah's] subsistence and cultural identity." Opening Br. Appellant at 12.

DNR manages the state-owned forestlands for the benefit of two public trusts: the common school trust for the benefit of K-12 public schools, and the state forestland trust for the benefit of counties. The commissioner of public lands is the administrator of DNR. RCW 43.30.105. Relevant here, DNR sells timber and other forest products from forest lands for the benefit of the public trusts. RCW 79.10.320. The Board sets policy and makes land management decisions for DNR, including approving or denying proposals for land exchanges. RCW 43.30.205; RCW 43.30.215.

---

[4] The court also denied the Makah's motion for a preliminary injunction. On appeal, the Makah did not assign error to this decision or argue that the request for preliminary injunction was improperly denied.

## B. THE PENINSULA EXCHANGE PROPOSAL

"The Peninsula Exchange involves eight parcels (approximately 1,001 acres) of state trust lands, appraised at $5,490,000." Clerk's Papers (CP) at 256. DNR's proposal would exchange these eight parcels for 19 privately owned parcels (approximately 1,395 acres) of forestlands, also appraised at $5,490,000, and owned by three Merrill & Ring subsidiaries. The parcels are located in the counties of Clallam, Jefferson, and Grays Harbor.

The state forestlands in the proposal are "primarily managed to produce income for the trust beneficiaries through logging." CP at 230. DNR also manages them for multiple public uses, including timber harvesting, removal of other valuable materials, hunting, and other public recreational opportunities. The Peninsula Exchange would consolidate state lands to improve road access to state lands, reduce DNR's management costs, benefit fish and wildlife habitats in this area, and increase the amount of gross acres and net operable forest acres of state lands.

In 2018, DNR and Merrill & Ring began actively negotiating the Peninsula Exchange. The lead DNR staff for this project, Robert Winslow, considered whether DNR was required to perform a threshold review under SEPA for the Peninsula Exchange. He concluded that a SEPA environmental review was not required for the Peninsula Exchange under the regulatory categorical exemption for state land exchanges, WAC 197-11-800(5)(b). However, SEPA review would be required for any subsequent timber harvest on the land. WAC 222-16-050.

## C. OUTREACH AND COMMUNICATION WITH THE TRIBES

DNR is required to work with impacted tribes and other stakeholders whenever it proposes a land transaction. RCW 79.17.010(5). Joenne McGerr, DNR's Director of Tribal Relations, organized government-to-government meetings between tribal members and DNR management

and staff as required by the public lands management statue.  McGerr's role is to conduct outreach, negotiate, and ensure appropriate tribal and agency representation in these meetings.  She also advises and reports to the commissioner of public lands on matters of interest or concern to tribal members and governments about DNR operations, plans, or policies.  Because dozens of parcels were impacted by the proposal, DNR conducted extensive outreach and communicated with various stakeholders on the peninsula, all of whom had an interest in the proposal.

One or more parcels in the Peninsula Exchange were either in tribal ceded areas or overlapped the areas that certain tribes indicated were areas of interest.  As a result, McGerr contacted the following tribes: Makah, Hoh, Quileute, Quinault, Jamestown S'Klallam, Port Gamble S'Klallam, Lower Elwha, and Skokomish.  On May 9, 2018, she invited these tribes to follow-up with her if they desired formal government-to-government meetings and/or consultation with DNR.

On May 16, DNR formally notified the Makah of the proposal:

> [DNR] is considering a land exchange.  The properties included are mostly within Clallam County, with a few located in Jefferson and Grays Harbor Counties.  Please see the attached map for an overview of the parcel layout.  If you have questions concerning any parcels in particular, I would be happy to provide more detailed map information.
>
> Prior to upcoming public meetings or public hearings, we are notifying you and offering an opportunity for questions or discussion.  We would like feedback from you by May 31st, though written comments from the general public will be accepted through two weeks from the public hearing, which has not been scheduled at this time.

CP at 247.

On June 8, 2018 the chairman of the Makah Tribal Council sent a letter to DNR requesting a formal government-to-government meeting related to the Peninsula Exchange "to ensure that

[DNR] is aware of and considers the [Makah's] interests and concerns with the proposed land exchange before a final decision is made." CP at 250. This letter expressed concerns that the Peninsula Exchange could affect their treaty hunting and gathering rights. Specifically, the Makah expressed concerns over a potential loss of access; diminished capacity to hunt, fish, gather, and engage in cultural activities, such as the traditional gathering of plants and ceremonial uses of this land; diminished ability to conduct scientific study and monitoring; and potential impacts to the Lake Ozette Sockeye salmon. McGerr responded and agreed to meet with the Makah's chief of staff on July 23. DNR subsequently considered the cultural and spiritual significance of the exchange parcels near Lake Ozette.

On July 23, the Makah met with the commissioner of public lands and other DNR staff and reiterated their concerns regarding the loss of access to public lands subject to the land exchange proposal. The Makah inquired as to whether they could purchase some of these lands to obtain exclusive, permanent access, instead of having DNR transfer the forestlands into private ownership. Because the Makah raised concerns about accessing Merrill & Ring lands, DNR's Olympic Region Manager Mona Griswold facilitated a follow-up meeting between the Makah and Merrill & Ring on October 5, 2018. At this meeting, Merrill & Ring told the Makah that access to the tracts of land near Lake Ozette would not change from the way DNR provided public access.

On April 5, 2019, DNR advised the Makah in writing that it did not have the authority to grant their request for exclusive, permanent access to state-owned trust lands because these lands were located within the ceded area of several other tribes who were parties to the Treaty of Point No Point. DNR concluded that granting the Makah's request could violate other tribes' treaty

rights. DNR expressed a willingness to explore purchase or exchange transactions between DNR and the Makah of other trust lands.

On September 5, DNR held a public hearing in Port Angeles on the proposal and took public testimony. Although DNR notified the Makah of the public hearing, no Makah tribal representatives identified themselves, testified, or provided written comment at the hearing, nor did the Makah provide DNR with any written comments during the 14-day comment period following the hearing.

On April 24, 2020, the Makah requested a second government-to-government meeting with DNR, less than two weeks prior to the Board's meeting at which the Peninsula Exchange proposal would be considered. The Makah's letter requested a "guarantee [of] perpetual hunting access through a broader easement that would impose continued access for exercise of [t]reaty rights without specifying a certain [t]ribe." CP at 221, 244 (internal quotation marks omitted).

On May 4, the second government-to-government meeting occurred with the full Makah Tribal Council, the commissioner of public lands, and key DNR staff involved in the proposal.

On May 5, the Board met to consider DNR's proposal. DNR provided the Makah's April 24 letter for consideration. The Board also considered other stakeholders' input during DNR's consultation process, including the written support for the proposal provided to DNR by the majority of the other impacted tribes. After deliberations, the Board passed a resolution approving the Peninsula Exchange.

On May 13, the commissioner of public lands and McGerr spoke with the chairman of the Makah Tribal Council to express an interest in finding a solution to address their concerns. DNR agreed to respond in writing and provide details about the exchange process and timeline. DNR

followed up with a letter on May 20 explaining its fiduciary duties and challenges with some of the Makah's requests. The commissioner proposed a collaborative process to engage the Makah and DNR to potentially explore other resolutions.

## II. Procedural History

On June 3, 2020, the Makah filed an action seeking a constitutional writ of certiorari against DNR, the commissioner of public lands, and the Board. On June 11, the Makah filed a motion for a preliminary injunction.

The Makah argued that DNR acted illegally and arbitrarily and capriciously when it approved the Peninsula Exchange without having conducted a SEPA environmental review and without having adequately consulted the Makah to address their concerns regarding the proposal prior to its approval.

DNR responded that SEPA review was not required because the land exchange fit within a categorical exemption from SEPA review for "real property transactions" by an agency including the "exchange of any publicly owned real property," but only if the property is not subject to a specifically designated and authorized public use established by the public landowner and used by the public for that purpose. CP at 206-07 (emphasis omitted, citing WAC 197-11-800(5)). DNR asserted that it did not specifically designate and authorize public uses on the parcels it managed that were part of the Peninsula Exchange. In support, DNR submitted sworn declarations stating that the parcels in the Peninsula Exchange were subject to broad general management practices for forestlands, but the parcels had not been subject to any "specifically designated and authorized for public use." CP at 207.

DNR explained that in contrast with the Peninsula Exchange lands, at times, DNR does "specifically designate[] and authorize[]" public use for certain state lands. CP at 214. Angus Brodie, the Deputy Supervisor for DNR's Uplands, declared that such lands include "campgrounds, parking lots associated with public use, and areas with public restrooms, kiosks, and signage." CP at 214. He explained that such parcels are often subject to written use agreements that compensate the public trusts or generate revenue for them.

Mona Griswold declared that as to the Peninsula Exchange parcels: "Although many uses are permitted on these parcels, the parcels have not been specifically designated for hunting or any other recreational use by DNR." CP at 230.[5]

On June 19, the superior court issued an oral ruling denying a constitutional writ. On June 24, the Makah appealed and sought an emergency stay due to the "extremely time sensitive nature of the appeal." CP at 347. A commissioner of this court granted a temporary stay pending briefing and hearing on the emergency stay. On July 7, the superior court then entered a written order.[6]

On July 17, our commissioner ultimately denied the stay, but accelerated review of this appeal. The Amici Tribes filed an amicus curiae brief arguing that we should dismiss this case under CR 19 because they are necessary and indispensable parties who cannot be joined due to their sovereign immunity.

---

[5] The Makah cite the general public use of forestlands and logging on state trust lands as an example of specifically designated and authorized public use. But DNR correctly points out that such lands contain easements granted by private landowners that do not allow public use and DNR has no authority over the logging roads.

[6] "A notice of appeal . . . filed after the announcement of a decision but before entry of the decision will be treated as filed on the day following the entry of the decision." RAP 5.2(g).

9

ANALYSIS

I. THE AMICI TRIBES ARE NOT NECESSARY OR INDISPENSABLE PARTIES UNDER CR 19

The Amici Tribes argue that this appeal should be dismissed because they are necessary and indispensable parties under CR 19 who cannot be joined due to their sovereign immunity.[7] Br. of Amici at 12. We can resolve this case without implicating treaty rights. So long as we do not decide any issue related to treaty rights, the Amici Tribes are not necessary and indispensable parties under CR 19.[8] Thus, dismissal of this appeal under CR 19 is not appropriate.

A. LEGAL PRINCIPLES

"CR 19 addresses when the joinder of [an] absent [party] is needed for a just adjudication." *Auto. United Trades Org. v. State*, 175 Wn.2d 214, 221, 285 P.3d 52 (2012) (AUTO). "Where the feasibility of joinder is contested, courts engage in a three-step analysis."[9] *AUTO*, 175 Wn.2d. at 221; *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. July 31, 1990). "Under CR 19(a), the court first determines whether [an] absent [party] [is] 'necessary' for a just adjudication." *AUTO*, 175 Wn.2d at 221-22; *Verity*, 910 F.2d at 558. "If the absentee[] [is] 'necessary,' the court determines whether it is feasible to order the absentee['s] joinder." *AUTO*, 175 Wn.2d at 222; *Verity*, 910 F.2d at 558. "Joinder is not feasible when tribal sovereign immunity applies." *AUTO*, 175 Wn.2d at 222; *See Equal Employment Opportunity Comm'n v. Peabody W. Coal Co.,* 400

---

[7] The Amici Tribes did not participate in the proceedings at the superior court level.

[8] DNR takes no position on this issue. Reply Br. of Resp. to Amici at 2.

[9] "Because CR 19 is based on and is substantially similar to Fed. R. Civ. P. 19, we may look to the abundant federal cases interpreting that rule for guidance." *AUTO*, 175 Wn.2d at 223.

F.3d 774, 780-81 (9th Cir.2005) ("In many cases in which we have found that an Indian tribe is an indispensable party, tribal sovereign immunity has required dismissal of the case.").

"If joining a necessary party is not feasible, the court then considers whether, 'in equity and good conscience,' the action should still proceed without the absentee[] under CR 19(b)." *AUTO*, 175 Wn.2d at 222; *Verity*, 910 F.2d at 558 n.5. CR 19 does not bar resolution of claims if the claims are "reasonably susceptible to adjudication without the presence of other tribes." *Verity*, 910 F.2d at 559. The party urging dismissal has the burden of persuasion. *Gildon v. Simon Prop. Group, Inc.,* 158 Wn.2d 483, 495, 145 P.3d 1196 (2006).

B.  ANALYSIS

The Amici Tribes claim they are necessary parties under CR 19(a)(2) because resolution of the issues on appeal will implicate their treaty rights. The Makah disagree, arguing that we need not resolve any issue involving treaty rights. We agree with the Amici Tribes that we cannot resolve any issue involving their treaty rights without their participation, but we also agree with the Makah that doing so is not necessary to resolve this case. We hold that the Amici Tribes are not necessary parties under CR 19.

It is well-established that a court cannot resolve claims involving treaty rights without participation from all of the tribal entitles whose rights would be impacted. *Verity*, 910 F.2d at 559; *Skokomish Indian Tribe v. Goldmark*, 994 F. Supp. 2d 1168, 1187-88 (W.D. Wash. Jan. 13, 2014). However, procedural claims that are not dependent on the resolution of treaty rights can be adjudicated. *Verity*, 910 F.2d at 559.

Here, adjudication of the Makah's procedural claims does not require a judicial determination of treaty rights among the various interested tribes. The Makah raise only two

procedural challenges: a challenge to DNR's decision that SEPA review is not warranted and a challenge regarding sufficient consultation. Resolution of these claims does not depend upon the resolution of any rights to access the exchange lands for any tribe. No rights of the Amici Tribes or their members need to be resolved for us to dispose of this case. The Makah's claims are "reasonably susceptible to adjudication without the presence of the other tribes." *Verity*, 910 F.2d at 559. Thus, the Amici Tribes are not necessary parties.

Further, resolving the Makah's procedural claims would not result in a risk of multiple, inconsistent rulings. Our decision addresses only whether DNR and the Board complied with SEPA and statutory consultation requirements when they approved the Peninsula Exchange.

If the Amici Tribes are not necessary parties, they are not indispensable parties. Thus, because we can resolve this case without implicating any of Amici Tribes' treaty rights, we hold that the Amici Tribes are not indispensable parties under CR 19.

## II. LEGAL PRINCIPLES: CONSTITUTIONAL WRIT[10]

"The Washington State Constitution recognizes the right to seek discretionary review of an administrative agency decision under the court's inherent constitutional power." *Federal Way Sch. Dist. No. 210 v. Vinson*, 172 Wn.2d 756, 769, 261 P.3d 145 (2011). Article IV, section 6 of the Washington Constitution grants a superior court constitutional authority to review

---

[10] A constitutional writ is not available if there is another avenue for relief; for example, review of an administrative decision. The parties agreed at oral argument that DNR land exchange decisions are not subject to review under chapter 34.05 RCW, the Administrative Procedures Act. Wash. Court of Appeals oral argument, *Makah Indian Tribe v. Comm'r of Public Lands.*, No. 54945-0-II (Nov. 24, 2020), at 6 min., 20 sec. through 6 min., 30 sec. (on file with court).

administrative decisions for illegal or manifestly arbitrary acts.  *Saldin Sec., Inc. v. Snohomish County*, 134 Wn.2d 288, 292, 949 P.2d 370 (1998).

"The fundamental purpose of the constitutional writ of certiorari is to enable [the] court . . . to determine whether the proceedings below were within the lower tribunal's jurisdiction and authority."  *Saldin*, 134 Wn.2d at 292.  The party challenging the agency's decision carries a heavy burden to demonstrate that the agency's decision was so clearly illegal that it calls for revision by a constitutional writ.  *Vinson*, 172 Wn.2d at 769.  The scope of court review under the constitutional writ is "'very narrow.'"  *Vinson*, 172 Wn.2d at 769, (quoting *Pierce County Sheriff v. Civil Serv. Comm'n of Pierce County*, 98 Wn.2d 690, 695, 658 P.2d 648 (1983)).

"[W]e adhere to the long accepted rule that a court may grant a constitutional writ of certiorari if no other avenue of appeal is available and facts exist that, if verified, indicate the lower tribunal has acted in an illegal or arbitrary and capricious manner."  *Saldin,* 134 Wn.2d at 294.  Arbitrary actions in this context are defined as "'willful and unreasoning action, without consideration and in disregard of facts and circumstances.  Where there is room for two opinions, action is not arbitrary and capricious even though one may believe an erroneous conclusion has been reached.'"  *Pierce County Sheriff*, 98 Wn.2d at 695, (quoting *State v. Rowe*, 93 Wn.2d 277, 284, 609 P.2d 1348 (1980)).

"[I]llegality is a nebulous term."  *Vinson,* 172 Wn.2d at 770 (alteration in original) (internal quotation marks omitted).  In the context of the constitutional writ of certiorari, "illegality refers to an agency's jurisdiction and authority to perform an act."  *Vinson*, 172 Wn.2d at 770.  "'[A]n alleged error of law is insufficient to invoke the court's constitutional power of review.'"  *Vinson*, 172 Wn.2d at 770 (alteration in original) (quoting *Wash. Pub. Employees. Ass'n v. Wash. Pers.*

*Res. Bd.*, 91 Wn. App. 640, 658, 959 P.2d 143 (1998)). If an agency is within its statutory authority to issue a decision under state law, its actions are not illegal under the constitutional writ analysis, and the motion for a constitutional writ is properly denied. *Vinson*, 172 Wn.2d at 769.

We review a superior court's decision to deny a constitutional writ of certiorari for an abuse of discretion. *Newman v. Veterinary Bd. of Governors,* 156 Wn. App. 132, 142, 231 P.3d 840 (2010). A court abuses its discretion *only* when its decision is manifestly unreasonable, or exercised on untenable grounds or for untenable reasons. *Gildon*, 158 Wn.2d at 494.

### III. STANDING

We first address below whether the Makah have standing to assert their challenge to DNR's SEPA decision absent reliance on arguments that require us to address the treaty rights of various tribes. We hold that the Makah have standing to assert their procedural challenges to DNR's Peninsula Exchange even without reliance on their treaty rights.[11]

"'To invoke constitutional certiorari to review actions of an administrative agency, a petitioner must establish standing to challenge the governmental action.'" *Newman*, 156 Wn. App. at 142 (quoting *Harris v. Pierce County,* 84 Wn. App. 222, 230, 928 P.2d 1111 (1996)). We apply a two part test to determine whether a person or entity has standing to seek a constitutional writ of certiorari. *Newman,* 156 Wn. App. at 142.

"First, the interest that the petitioner seeks to protect must be 'arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'"

---

[11] The Makah filed this action seeking a constitutional writ of certiorari. The Makah did not sue under the Uniform Declaratory Judgments Act (UDJA), chapter 7.24 RCW. Accordingly, we decline to address Amici Tribes' argument related to the UDJA.

*Snohomish County Prop. Rights Alliance v. Snohomish County,* 76 Wn. App. 44, 52, 882 P.2d 807 (1994) (internal quotation marks omitted) (quoting *Trepanier v. City of Everett,* 64 Wn. App. 380, 382, 824 P.2d 524 (1992)). "Second, the petitioner must allege an 'injury in fact,' *i.e.,* that he or she will be 'specifically and perceptibly harmed' by the proposed action." *Snohomish County Prop. Rights Alliance,* 76 Wn. App. at 53 (internal quotation marks omitted) (quoting *Trepanier,* 64 Wn. App. at 382).

To establish standing to pursue a claim alleging violation of a procedural right, the standing requirements are relaxed to some degree. The Makah must "'identify a constitutional or statutory procedural right'" that has allegedly been violated, "'demonstrate a reasonable probability that the deprivation of the procedural right will threaten a concrete interest'" of the Makah's, and show that the Makah's interest "'is one protected by the statute.'" *Lands Council v. Wash. State Parks & Recreation Comm'n*, 176 Wn. App. 787, 801-02, 309 P.3d 734 (2013) (quoting *Five Corners Family Farmers v. State*, 173 Wn.2d 296, 303, 268 P.3d 892 (2011)).

The Makah satisfy these standing requirements. First, the general public use, including the Makah's public use, of the Peninsula Exchange parcels is arguably within the zone of interests protected by SEPA and the statutory tribal consultation requirement. RCW 43.21C.020; RCW 79.17.010(5). Second, the Makah adequately detail an alleged injury in fact because they have alleged that the proposal poses a threat to limit the general public's (including the Makah's) access to the parcels being exchanged for a wide range of activities, including hunting, gathering, and other subsistence activities of cultural importance. Both SEPA and the statutory tribal consultation requirement arguably impose procedural prerequisites to the Peninsula Exchange. Thus, whatever the outcome on the merits, the Makah have demonstrated "'reasonable probability that the

deprivation of the procedural right will threaten a concrete interest'" of the Makah's. *Lands Council*, 176 Wn. App. at 802 (quoting *Five Corners*, 173 Wn.2d at 303). Accordingly, we hold that the Makah have standing to assert their procedural challenges to DNR's Peninsula Exchange.

## IV. SEPA'S EXEMPTION FOR LAND EXCHANGES APPLIES TO THE PENINSULA EXCHANGE

### A. SEPA ENVIRONMENTAL REVIEW: WHEN REQUIRED AND WHEN EXEMPT

SEPA requires governmental agencies to prepare an environmental impact statement (EIS) for all major actions having a probable significant, adverse environmental impact. RCW 43.21C.031(1). Actions categorically exempt under RCW.43.21C.110(1)(a) and RCW 43.21C.450 do not require environmental review or the preparation of an EIS; these exemptions include a broad range of government agency actions approving public and private activities. RCW 43.21C.031(1). Our Supreme Court has affirmed that certain government agency actions are categorically exempt from SEPA under RCW 43.21C.031(1). *Dioxin/Organochlorine Ctr. v. Pollution Control Hearings Bd.*, 131 Wn.2d 345, 365, 932 P.2d 158 (1997).

The legislature directed the Department of Ecology to adopt uniform rules and guidelines interpreting and implementing SEPA, including specific authorization to identify "[c]ategories of governmental actions which are not to be considered as potential major actions significantly affecting the quality of the environment" requiring an environmental impact statement. RCW 43.21C.110(1)(a); *see also* WAC 197-11-060. Ecology adopted WAC 197-11-800 through -890 to identify actions which are categorically exempt from SEPA. RCW 43.21C.031(1) expressly exempts a proposal from the environmental impact statement requirement if its fits within any of the exemptions in the SEPA regulations that Ecology has adopted.

16

WAC 197-11-800(5)(b) is one of Ecology's categorical exemptions. WAC 197-11-800(5)(b) generally exempts from SEPA the "transfer or exchange of any publicly owned real property, but *only* if the property is not subject to a *specifically designated and authorized public use* established by the public landowner and used by the public for that purpose." (Emphasis added.)

In 2012, the legislature directed Ecology to update WAC 197-11-800(5) to preserve and expand the scope of SEPA's categorical exemptions. LAWS OF 2012, 1st Spec. Sess., ch. 1, § 301(1). Ecology, citing the legislature's directive, amended WAC 197-11-800(5) to add the phrase "specifically designated," as well as the reference to approval by the public landowner of the property related to the use of land by the public. Wash. St. Reg. 14-09-026. The amended regulation requires that when the public landowner has "specifically designated *and* authorized public use" on the public lands in a proposed land exchange, the proposal is subject to SEPA review. Wash. St. Reg. 14-09-026 (emphasis added).

RCW 43.21C.090 states,

> In any action involving an attack on a *determination by a governmental agency* relative to *the requirement or the absence of the requirement*, or the adequacy of a "detailed statement," the decision of the governmental agency *shall be accorded substantial weight*."

(Emphasis added.) Our supreme court has interpreted this provision to accord substantial deference to the responsible governmental agency making the determination as to a SEPA categorical exemption. *See Cornelius v. Dep't of Ecology*, 182 Wn.2d 574, 598 n.4, 344 P.3d 199 (2015) (the term "responsible agency" means "the agency that seeks to develop or the agency that is presented with a proposal for development"). Notably, the legislature chose here to defer to

determinations "by a governmental agency," and did not limit this deference to determinations by Ecology. As a result, DNR's determination that an environmental impact statement is not required for the Peninsula Exchange because this exchange is categorically exempt, is entitled to substantial weight under RCW 43.21C.090.

The substantial weight requirement directs us to review the responsible agency's determination under a "clearly erroneous" standard. *Cornelius*, 182 Wn.2d at 599. An agency's determination is clearly erroneous when, although there is evidence to support it, we are left with the definite and firm conviction that a mistake has been made. *PT Air Watchers v. Dep't of Ecology,* 179 Wn.2d 919, 926, 319 P.3d 23 (2014).

B. DNR ADOPTED REGULATIONS FOR ITS MANAGED LANDS

In its trust management role, DNR has the discretion to determine whether a given parcel of trust lands is "authorized" for multiple uses, considering whether multiple uses are "in the best interests of the state and the general welfare of the citizens." RCW 79.10.100. The legislature provided a list of uses that it found to be potentially "compatible with those basic activities necessary to fulfill the financial obligations of trust management," and many of these multiple uses are public uses like recreation, hunting, fishing, and use of the public lands as public rights of way. RCW 79.10.120.

DNR adopted Public Access and Recreation rules that define the standards applicable to DNR managed public lands. *See* WAC 332-52-002. Under WAC 332-52-002(6), DNR *may* allow activities, including public use, on DNR managed trust lands so long as that use is consistent with state statutes and regulations, land management objectives, and trust obligations. Under WAC 332-52-002(6)(d), the activity must also be "authorized or permitted by the department."

WAC 332-52-010 defines "authorized" as written approval given by DNR. WAC 332-52-010 defines "designated" as "any facility, trail, or location that has been approved by the department for public use."

C. ANALYSIS

1. WAC 197-11-800(5)(b)

To determine the meaning of a regulation, we give effect to the promulgating agency's intent by discerning the regulation's plain meaning. *PeaceHealth St. Joseph Med. Ctr. v. Dep't of Revenue*, 196 Wn.2d 1, 7-8, 468 P.3d 1056 (2020). "To ascertain a regulation's plain meaning, we look to the ordinary meaning of its text[,] . . . the context in which the regulation applies, related regulations and statutes, and the statutory scheme of which the regulation is a part." *Grays Harbor Energy, LLC v. Grays Harbor County*, 175 Wn. App. 578, 584, 307 P.3d 754 (2013). If the regulation is ambiguous, we apply canons of statutory construction in order to interpret the regulation, including consideration of the regulation's history and intent. *Grays Harbor Energy*, 175 Wn. App. at 584. The legislature's declaration of purpose is an important guide to understanding the breadth of authority the Legislature has delegated to a state agency. *Armstrong v. Dep't of Fisheries*, 91 Wn App. 530, 537, 958 P.2d 1010 (1998).

The Makah argue that because DNR has "specifically designated and authorized public use" on the Peninsula Exchange parcels, the exception to the categorical exemption applies, and SEPA review is required here. Opening Br. Appellant at 30. DNR argues it has not "specifically designated and authorized public use" in writing the parcels in the Peninsula Exchange. Opening Br. of Resp't at 13. Both parties argue that if we determine that the regulation is ambiguous, then the rulemaking history supports their interpretation.

WAC 197-11-800(5)(b) states:

> The following real property transactions by an agency shall be exempt: . . . The sale, transfer or exchange of any publicly owned real property, but only if the property is not subject to a specifically designated and authorized public use established by the public landowner and used by the public for that purpose.

The regulation makes it clear that the property must be both "specifically designated *and* authorized." But what constitutes "specifically designated" is unclear. We apply the canons of statutory construction to interpret the regulation, and, because the regulation is ambiguous to some extent, we also consider the regulation's history. *Grays Harbor Energy*, 175 Wn. App. at 584.

Because the regulatory language is ambiguous, we look in part to the rulemaking history. Here the reference to "specifically designated" was added after legislative direction to expand the scope of the categorical exemptions. Wash. St. Reg. 14-09-026. This history supports a narrow reading of the exception to the exemption that gives meaning to the addition of "specifically designated" as a limitation.

Moreover, under RCW 43.21C.090, DNR's determination that the Peninsula Exchange is categorically exempt from SEPA review is entitled to "substantial weight." Contrary to the Makah's argument, the deference afforded under this statute is not limited to Ecology. Instead it expressly applies to "governmental agency" decisions related to application of SEPA requirements. RCW 43.21C.090. Thus, DNR is entitled to deference as a governmental agency under the statute.

This deference to DNR does not conflict with RCW 43.21C.110(1)(a) as the Makah contend because it does not mean that all land exchanges will be exempt from SEPA review. A land exchange involving a specific designation for public use would require SEPA review under

DNR's application of the regulation. Thus, we accord substantial weight to DNR's application of the regulation.

### 2. DNR's Application of WAC 197-11-800(b)(5)

The Makah argue that DNR has allowed multiple public uses on the 1,001 acres it manages in the Peninsula Exchange, including hunting, fishing, and the use of a Discover Pass to access these lands. Based on these public uses on parcels in the Peninsula Exchange, the Makah argue that DNR has "specifically designated and authorized public use" on these parcels in the Peninsula Exchange, and thus, SEPA review is required for the Peninsula Exchange. Opening Br. Appellant at 27-32.

Under DNR's rules, "authorized" is defined as "written approval given by [DNR]." WAC 332-52-010. DNR defines the term "designated" as "any facility, trail, or location that has been approved by the department for public use." WAC 332-52-010. DNR argues that there is no evidence that it "specifically designated and authorized public use" in writing on the parcels in the Peninsula Exchange, and thus, SEPA review is not required. Opening Br. of Resp't at 14-15. DNR cites declarations explaining that the parcels in the Peninsula Exchange are subject to broad general management practices for forestlands, but it has not in writing "specifically designated and authorized public use" on the lands in the Peninsula Exchange.

Angus Brodie, the Deputy Supervisor for DNR's Uplands, declared that DNR has "specifically designated and authorized" some state lands for public use. CP at 214. They include "campgrounds, parking lots associated with public use, and areas with public restrooms, kiosks, and signage." CP at 214. He explained that such parcels are often subject to written agreements that compensate the public trusts for allowing the public use.

21

Griswold declared that the state lands within the Olympic Peninsula Region, including those in the Peninsula Exchange, are managed by DNR under the multiple use statutes to provide for multiple simultaneous uses; some of these uses include timber harvesting, removal of valuable materials, hunting, and other public recreational opportunities including, hiking, biking and bird watching. She also explained that "[a]lthough many uses are permitted on these parcels, the parcels have not been specifically designated for hunting or any other recreational use by DNR." CP at 230.[12, 13]

Griswold further explained that DNR easements were acquired from neighboring landowners for access to most of the trust lands in the Peninsula Exchange; however, for some uses, public use of the easement is not permitted and in others, DNR has no roads on certain parcels, or access easements through private lands. "While the multiple use mandate generally authorizes many different activities on state-managed trust lands, DNR has not specifically designated any of the roads on the trust land parcels included in the Peninsula Exchange for public

---

[12] The Makah cite the general public use of forestlands and logging on state trust lands as an example of specifically designated and authorized public use. But DNR correctly points out that such lands contain easements granted by private landowners that do not allow public use and DNR has no authority over the logging roads.

[13] The Makah also argue that, assuming they have legitimate treaty rights to the Peninsula Exchange parcels, that those uses are "public uses" under the exception to the categorical exemption. The Makah also claim that certain state agency actions recognize their treaty rights to the parcels in the Peninsula Exchange. As examples, the Makah cite to DNR's decision to provide a no-cost equivalent of the "Discover Pass" for tribal members, and Department of Fish and Wildlife's recognition of tribal members' rights to hunt on public lands in this area. However, we agree with the Amici Tribes that we cannot resolve treaty rights claims without implicating the treaty rights of other tribes claiming rights in the area. We therefore decline to address these arguments further.

use, and does not maintain any designated public parking lots on any of the parcels," nor does DNR regulate or enforce hunting regulations on any of these parcels.

By way of contrast, DNR has granted a trail easement to Kitsap County in exchange for $71,160. Because the easement specifically designated and authorized a public recreation trail on state lands, DNR determined that this exchange was *not* exempt from SEPA review. This is an example of a specific designation of a portion of public land–a trail–for public use.

Here, there was no written specific designation and authorization for public use by DNR on the parcels in the Peninsula Exchange. DNR has reasonably applied the regulation to the facts, concluding that the land being exchanged had not been specifically designated and authorized for public use by DNR. After thoroughly reviewing the record, we are not left with a definite and firm conviction that DNR, as the responsible agency, made a mistake by determining that the parcels involved in the Peninsula Exchange are categorically exempt from SEPA. Because we are not left with a definite and firm conviction that a mistake has been made, DNR's decision was not clearly erroneous. Because DNR was within its statutory authority as the responsible agency to issue its decision, its determination that the Peninsula Exchange is exempt from SEPA is not illegal under the constitutional writ analysis, and the motion for a constitutional writ was properly denied. *Vinson*, 172 Wn.2d at 769.

In sum, based on the record, we hold that DNR did not make a written specific designation and authorized public use on the parcels in the Peninsula Exchange. We also hold that because DNR's determination was reasonable, the superior court did not abuse its discretion when it denied the writ on this basis.

## V. DNR PROPERLY CONSIDERED THE PENINSULA EXCHANGE PROPOSAL WITHOUT POTENTIAL TIMBER SALES

The Makah alternatively argue that because future timber sales may occur on lands obtained by DNR in the Peninsula Exchange, these future timber sales qualify as "proposals" subject to SEPA review. They also argue that DNR cannot segment the proposal separating some actions that are categorically exempt and some that are not. Thus, according to the Makah, consolidated SEPA review of both the Peninsula Exchange and the timber sales together is warranted. DNR argues that these timber sales do not qualify as "proposals," and they are not sufficiently definite for a meaningful SEPA review. DNR also argues that even if they qualify as proposals, the timber sales are not "segments" of or connected to the Peninsula Exchange proposal constituting a "single course of action." Opening Br. of Resp't at 31-33. We agree with DNR and hold that DNR properly determined that the Peninsula Exchange was exempt from SEPA, without considering potential timber sales as part of the proposed land exchange.

A. TIMBER SALES: PROPOSALS

We first address whether prospective timber sales on parcels that DNR will obtain in the Peninsula Exchange are "proposals" sufficiently definite under WAC 197-11-305(1)(b)(i) to require consolidated SEPA review. We hold they are not.

DNR must manage state public trust lands in the best interests of its trust beneficiaries to include the forestlands in the Peninsula Exchange. *Chuckanut Conservancy v. Dep't of Natural Res.*, 156 Wn. App. 274, 287-288, 232 P.3d 1154 (2010). Therefore, DNR must manage the Peninsula Exchange lands to generate revenue for the public trust, which generally involves selling

harvested timber, managed on a sustainable yield basis. *Chuckanut Conservancy*, 156 Wn. App. at 288.

A "proposal" will not qualify for a categorical exemption from SEPA if it is a "segment of a proposal that includes . . . [a] series of actions, physically or functionally related to each other, some of which are categorially exempt and some of which are not." WAC 197-11-305(1)(b)(i).

The Makah argue that SEPA applies to the prospective timber sales within the Peninsula Exchange "because of the public values associated with public lands" citing WAC 332-41-833(2)(b). Opening Br. Appellant at 37. They also argue that the names, sizes, approximate values, and logging techniques for the timber sales have already been determined and that DNR staff acknowledged that preparation for timber sale auctions would commence "[a]s soon as the [Peninsula] Exchange closes." Second Decl. of Mona Griswold at 3 The Makah argue that DNR has conceded that each element of WAC 197-11-305(1)(b)(i) is met and that the Peninsula Exchange and timber sales are a "series of actions, physically or functionally related to each other," and that DNR acknowledged this direct casual connection when it sought a bond. Opening Br. Appellant at 37 (citing DNR Resp. on Motion for Stay at 19-20). DNR argues that the Peninsula Exchange and the prospective timber sales do not constitute a single "proposal" requiring consolidated SEPA review.[14]

To determine whether the Peninsula Exchange and the timber sales constitute a single proposal, we must examine both WAC 197-11-055(2) and WAC 197-11-060(3).

---

[14] DNR first disclosed the prospective timber sales in response to the Makah's motion for emergency stay; it did so because the Makah had requested a preliminary injunction and if granted, any delayed profits from potential timber sales were relevant for the court to determine the appropriate bond amount.

WAC 197-11-055(2)(a) states in relevant part:

A proposal exists when an agency is presented with an application or has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal *and* the environmental effects can be meaningfully evaluated.

WAC 197-11-055(2)(a)(i) states:

The fact that proposals may require future agency approvals or environmental review shall not preclude current consideration, as long as proposed future activities are specific enough to allow some evaluation of their probable environmental impacts.

WAC 197-11-060(3) states in relevant part:

Agencies *shall make certain* that the proposal that is the subject of environmental review is properly defined.

(Emphasis added.)

Under the plain language of WAC 197-11-055(2)(a)(i), a "proposal" must allow for a meaningful SEPA review. WAC 197-11-060(3) requires that DNR, as the lead environmental agency here, must make certain that the proposal, subject to SEPA review, is sufficiently defined.

Here, based on the record, there are specific details of the timber sales which were still unknown. Timber sales require extensive planning, including timber cruises, appraisals, and the forest practices application review. *See* Second Griswold Decl. Unless the timber harvest is an exempt small sale under WAC 332-41-833, proposed timber sales are subject to independent SEPA review.[15]

---

[15] WAC 332-41-833 exempts only small timber sales with harvest units under 20 acres and below a certain appraisal amount, which do not have a potential for significant impact on the environment.

We accord substantial weight to DNR's decision that the anticipated timber sales did not trigger SEPA review. RCW 43.21C.090. Here, many of the required steps preceding a timber sale had not occurred because the parcels in the Peninsula Exchange were not yet under DNR's management or control. DNR determined that potential timber sales were not sufficiently definite for meaningful SEPA review at the time of the Peninsula Exchange. Thus, any future timber sales were not part of a single proposal that included the Peninsula Exchange. Unless exempt under WAC 332-41-833, sufficiently developed timber sale proposals would independently be subject to SEPA review.

B. TIMBER SALES: SEGMENTS

We next address whether the timber sales are "segments" of or so closely related to the Peninsula Exchange as to constitute a single course of action under WAC 197-11-305(1)(b)(i) requiring consolidated SEPA review.

WAC 197-11-060(3) provides in relevant part:

> (b) Proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action shall be evaluated in the same environmental document. . . . Proposals or parts of proposals are closely related, and they shall be discussed in the same environmental document, if they:
>
> > (i) *Cannot or will not proceed unless the other proposals (or parts of proposals) are implemented simultaneously with them*; or
> >
> > (ii) *Are interdependent parts* of a large proposal and depend on the larger proposal as their justification or for their implementation.
>
> (c) (**Optional**) Agencies *may* wish to *analyze "similar actions"* in a single environmental document. . .

(Emphasis added.) Thus, WAC 197-11-060(3)(b) requires that proposals that are closely related enough to be a "single course of action" must be evaluated together in the same documents.

The Makah argue that timber sales are segments of or closely connected to the Peninsula Exchange and together constitute a single course of action warranting SEPA review for both. DNR argues that even if the timber sales qualify as a proposal for SEPA review, the Peninsula Exchange can, and likely will, proceed even if the predicted timber sales do not occur. DNR also argues that the prospective timber sales are not interdependent parts of the Peninsula Exchange and that the Makah have presented no evidence that DNR would not complete the Peninsula Exchange without the timber sales.

We agree with DNR that the timber sales are not segments of or closely related to the Peninsula Exchange under WAC 197-11-060(3)(b). Because there is no evidence in this record that DNR would not pursue the Peninsula Exchange if it could not engage in timber sales on land it acquires under the exchange, these are not a single course of action under WAC 197-11-305(1)(b)(i) requiring consolidated SEPA review.

## VI. DNR ADEQUATELY CONSULTED WITH AND CONSIDERED THE MAKAH'S CONCERNS

The Makah lastly argue that DNR failed to adequately consult with them and consider their concerns related to the Peninsula Exchange, violating the land exchange requirements in the public lands management statute, RCW 79.17.010. We hold that DNR adequately consulted with the Makah and considered their concerns.

RCW 79.17.010(5) provides:

> Prior to executing an exchange under this section, and in addition to the public notice requirements set forth in RCW 79.17.050, *the department shall consult with . . . tribes . . .* to identify and address cultural resource issues and the potential of the state lands proposed for exchange to be used for open space, park, school, or critical habitat purposes.

(Emphasis added.)

28

RCW 79.17.020(3) similarly provides:

Prior to executing an exchange under this section, and in addition to the public notice requirements set forth in RCW 79.17.050, [DNR] *shall consult with . . . tribes . . .* to identify and address cultural resource issues, and the potential of the state lands proposed for exchange to be used for open space, park, school, or critical habitat purposes.

(Emphasis added.)

Here, DNR notified the Makah of the Peninsula Exchange. DNR staff met with and communicated with the Makah multiple times. Public Lands Commissioner Hillary Franz met with the Makah to discuss potential acquisition of the land involved and the Makah's concerns regarding access to the land being exchanged. DNR facilitated a meeting between the Makah and Merrill & Ring to address the Makah's access concerns.

There is ample evidence in this record that DNR complied with RCW 79.17.010(5) and RCW 79.17.020(3) and consulted with the Makah and considered their concerns prior to the Board approving the Peninsula Exchange. Because DNR complied with the law regarding consultation, its decision following that consultation was not illegal under the constitutional writ analysis. *Vinson*, 172 Wn.2d at 769. The superior court did not abuse its discretion when it denied the writ.

CONCLUSION

Because we resolve this appeal without implicating any treaty rights of the Amici tribes, we hold that the Amici Tribes are not necessary or indispensable parties. Accordingly, dismissal of this appeal under CR 19 is not appropriate. We further hold that DNR's decision that the Peninsula Exchange was categorically exempt from SEPA review was not clearly erroneous. Additionally, DNR complied with the public lands management statute by adequately consulting with the Makah prior to the Board's approval of the Peninsula Exchange. Because the superior

court's decision to deny the writ was not manifestly unreasonable, or exercised on untenable grounds or for untenable reasons, we hold that the superior court did not abuse its discretion. We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, J.

We concur:

GLASGOW, A.C.J.

CRUSER, J.